# In the United States Court of Federal Claims

No. 18-1803C

(Filed Under Seal: April 19, 2019)

(Reissued: April 29, 2019)

<table>
<tr><td>

**MARK DUNNING INDUSTRIES, INC.,**

       **Plaintiff,**

**v.**

**UNITED STATES,**

       **Defendant,**

    **and**

**ZERO WASTE SOLUTIONS, INC.,**

       **Defendant-Intervenor.**

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Post-award bid protest; compliance with amended solicitation; reasonableness of awardee's bid; responsibility determination; equal treatment of offerors

</td></tr>
</table>

Nicholas T. Solosky, Fox Rothschild LLP, Washington, D.C., for plaintiff.  Of counsel was Doug Hibshman, Fox Rothschild LLP, Washington, D.C.

Joseph A. Pixley, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Harry Parent, Trial Attorney, Contract & Fiscal Law Division, U.S. Army Legal Services Agency, Fort Belvoir, Virginia.

Julia Di Vito, PilieroMazza PLLC, Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER[1]

LETTOW, Senior Judge.

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  After the parties' proposals were received, a hearing on redactions was held April 29, 2019.  The resulting redactions are shown by asterisks enclosed within brackets, *e.g.*, "[***]."

Plaintiff Mark Dunning Industries, Inc. ("Dunning") protests the decision of the U.S. Army Contracting Command Fort Benning (the "Army") to award a solid waste disposal contract to Zero Waste Solutions, Inc. ("Zero Waste"). The procurement involves disposal of solid waste at Fort Benning, Georgia, and was made to the lowest priced responsible bidder. Dunning is the incumbent service provider and one of two bidders for the contract.

Dunning contends that the Army committed procurement error by: (1) accepting Zero Waste's bid despite Zero Waste's supposed failure to accept one amendment to the solicitation, Compl. ¶¶ 29-39; (2) awarding the contract to Zero Waste despite an unrealistic bid 31% below the government's cost estimate and one that omitted key scopes of work, Compl. ¶¶ 40-80; (3) finding Zero Waste as a responsible bidder despite a lack of experience, equipment, or infrastructure, Compl. ¶¶ 81-88; and (4) providing Zero Waste with different information about government furnished resources to the detriment of Dunning's bid, Compl. ¶¶ 89-93. Dunning asks that the court declare the Army's award decision to be arbitrary, unreasonable, capricious, an abuse of discretion, and inconsistent with the solicitation's terms. Compl. at 26. Dunning further requests that the court enjoin performance by Zero Waste and award the contract to Dunning. Compl. at 26.

The United States (the "government") produced the administrative record on December 11, 2018, ECF No. 20, and subsequently corrected it three times, first on February 25, 2019, Def.'s Unopposed Mot. to Amend/Correct Admin. R., ECF No. 24; Order of Feb. 26, 2019, ECF No. 25, second on March 12, 2019, Def.'s Second Unopposed Mot. to Amend/Correct Admin. R., ECF No. 31; Order of Mar. 13, 2019, ECF No. 32, and finally on March 29, 2019, Def.'s Third Mot. to Amend/Correct Admin. R. ECF No. 37, Order of Mar. 29, 2019, ECF No. 38.[2]

Dunning filed a motion for judgment on the administrative record on January 11, 2019. Pl.'s Mot. for Judgment on the Admin. R. ("Pl.'s Mot."), ECF No. 21. The government responded to Dunning's motion and also cross-moved for judgment on the administrative record on February 26, 2019, Def.'s Opp'n to [Pl.'s Mot.] & Def.'s Cross-Mot. for Judgment on the Admin. R. ("Def.'s Cross-Mot."), ECF No. 27. Dunning replied to the Army's response and cross-motion on March 14, 2019. Reply Mem. in Further Support of [Pl.'s Mot.] & Mot. to Suppl. the Admin. R. ("Pl.'s Reply"), ECF No. 34.[3] Due to the extensive nature of the government's third correction to the administrative record, which belatedly added over 400 pages to the record bearing directly on issues pending before the court, the court permitted Dunning to file a supplemental reply, *see* Revised Scheduling Order (Mar. 25, 2019), ECF No. 36, which Dunning filed on April 5, 2019, Suppl. to Reply Mem. in Further Supp. of [Pl.'s Mot.] ("Pl.'s Suppl. Reply"), ECF No. 41. Dunning also requested costs for having to prepare a supplemental reply. *See* Pl.'s Mot. for Atty's' Fees Under [RCFC 54] ("Pl.'s Fees Mot."), ECF No. 42. The government filed its response on April 11, 2019, *see* Def.'s Reply to [Pl.'s Suppl.

---

[2]The administrative record is consecutively paginated and divided into 77 tabs. Citations to the record cite to the tab and page, as "AR [tab]-[page]" (*e.g.*, AR 36-1770).

[3]In light of the Army's third correction to the record, Dunning's motion accompanying its reply to correct the record is moot. The e-mails it sought to include in the record are embraced by the third correction and contained within AR Tab 68. *Compare* Pl.'s Reply Attach. 1 at 1-6 (denoted SuppAR 000001-06), *with* AR 68-2267 to 72.

Reply] ("Def.'s Suppl. Br."), ECF No. 43, and the court held a hearing on the outstanding motions on April 12, 2019.

The court concludes that Dunning's contentions of error lack merit. Accordingly, Dunning's motion for judgment on the administrative record is denied, and the government's cross-motion for judgment is granted.

## FACTS[4]

### A. *The Army's Solicitation for Waste Removal Services*

On July 29, 2016, the Army issued a solicitation for solid waste disposal services for Fort Benning, Georgia (the "solicitation"). AR 25-1212. The solicitation invoked the sealed bidding procedures of 48 C.F.R. ("FAR") Part 14. *See* AR 25-1212 (specifying invitation for bids), 1278 (incorporating by reference FAR sealed bidding clauses); *see also* FAR §§ 14.000, 14.101 (discussing sealed bidding).

The solicitation, as amended, specified the various waste removal services required and the estimated annual quantity of services, each with a specific contract line item number. *E.g.*, AR 25-1214 (CLIN 0002, estimating 19,200 tons of trash annually), 25-1216 (CLIN 0005, estimating collection of sixteen 35-cubic-yard solid waste compactors each month).[5] Offerors would bid a firm-fixed-price for the unit in each line item, while the Army would pay for actual services used based on the firm-fixed-price bid per unit. AR 12-474 (invitation for bid, specifying a "[r]equirements contract with Firm-Fixed Price Task Orders"). The award would consist of a one-month phase-in period, a 10-month base period, four one-year option periods, and a one-month phase-out period. AR 25-1313 to 14. Bids were due by June 14, 2018. AR 25-1212.[6]

The solicitation provided that the government had no obligation to provide any materials, property, equipment, items, or services, AR 25-1351; *see also* AR 25-1312, but had the right to provide any of the materials, property, or equipment that was to be furnished by the contractor, AR 25-1352. The solicitation specified that the contractor must "remove all vehicles, trailers and equipment from the installation at the end of each workday, unless otherwise directed by the [contracting officer]." AR 25-1352.

---

[4]The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[5]The solicitation was amended 12 times. *See* AR 25-1214 (conformed solicitation, reflecting amendment 12). References to the solicitation refer to the solicitation after the twelfth amendment unless otherwise noted.

[6]Bids were originally due by August 29, 2016, AR 12-446, but the deadline was extended by several amendments.

The solicitation would make the award "to the responsible bidder whose bid represents the lowest price for the required services per FAR [§] 52.214-10." AR 25-1308; *see also* FAR §§ 14.103-2(d), 14.408-1(a), 14.408-2(a), 52.214-10(a). "Responsible" meant compliance with FAR § 9.104-1, namely: having adequate financial resources or the ability to obtain them; being able to comply with the delivery and performance schedule considering any preexisting obligations; having a satisfactory record of performance, integrity, and business ethics; and possessing, or able to obtain, the necessary organization, experience, management, and technical resources to perform the contract. *See* AR 25-1308; *see also* FAR § 9.104-1. Past performance would be considered when determining responsibility. AR 16-942; *see also* FAR § 9.104-3.

## B. *Dunning's Protest of the Solicitation & the Army's Corrective Action*

The solicitation was amended 12 times in response to extensive questions by bidders and protests before the Army and Government Accountability Office ("GAO"). Shortly after the Army posted the solicitation in July 2016, Dunning sent the Army a list of 13 issues that would inhibit accurate bidding. AR 45-1922. Amendment 0001 extended indefinitely the bid deadline to allow the Army to respond to these issues. AR 13-549. Amendment 0002 issued June 29, 2017, was intended to address the issues Dunning had raised by adjusting the quantities for some services, increasing the option years from one to three, and answering 105 industry questions, AR 14-551, 844 to 857. One answer provided that the tipping fee for 2016 "was approximately $26.50 per ton" and that the contractor was not allowed to profit from tipping fees. AR 14-856. Amendment 0002 also established a new bid deadline of August 1, 2017. AR 14-551.

Dunning responded the next day, June 30, 2017, with a list of 10 additional concerns. AR 44-1919 to 20. Subsequently, with the bid deadline approaching, Dunning twice reiterated these concerns. AR 45-1921 (July 13 inquiry); AR 46-1989 (July 20 inquiry). In the absence of a response, on July 21, 2017, Dunning filed a protest of the solicitation with the Army. AR 51-2028 to 31. Amendment 0003 of July 28, 2017, extended the deadline indefinitely to allow for the Army to respond to Dunning's agency protest. AR 15-858.

The Army responded by issuing Amendment 0004 on December 4, 2017. AR 16-860. Amendment 0004 provided the incumbent contractor's (*i.e.*, Dunning's) current collective bargaining agreement, modified the quantities for many line items, revised the statement of work, and answered 62 additional questions. AR 16-860 to 945.[7] Two answers informed contractors that they could lease an on-site laydown area from the Army in which to store trucks and equipment when not in use. AR 16-938 to 39 (questions 19 and 24). The amendment also extended the bid deadline to December 12, 2017. AR 16-860.

Dunning filed a second protest of the solicitation with the Army on December 5, 2017. AR 51-2015; *see also* AR 51-2024 to 25 (supplemental protest). Dunning alleged, among other things, that the amended solicitation did not align contract line item descriptions to the technical exhibits, did not state an estimated number of extra, unscheduled containers that would be necessary, and called for services at locations where no collection would actually be required. AR 51-2016 to 18. Amendments 0005 and 0006 extended the bid deadline to December 27,

---

[7]Dunning's collective bargaining agreement, as provided to the Army in August 2016, is embedded within AR Tab 45, beginning on AR 45-1946.

2017, and then to January 9, 2018, to allow time for the Army to respond to Dunning's second agency protest.  AR 17-946; AR 18-948.

The Army decided to take corrective action on December 15, 2017, consisting of "reviewing both the locations and quantities" for containers.  AR 47-1991.  When the Army had not amended the solicitation by January 5, 2018, Dunning filed a third protest of the solicitation, this time with GAO.  AR 52-2035.  The Army issued Amendments 0007 and 0008 to further extend the bid deadline to January 22, 2018, and then to February 15, 2018.  AR 19-950 (Amendment 0007); AR 20-952 (Amendment 0008).  GAO, in light of the Army's promise to take corrective action, dismissed the protest, and the Army subsequently began to implement its corrective action, *see* AR 57-2074 to 75, culminating with the issuance of a revised solicitation on May 22, 2018, as Amendment 0009, AR 21-954.  The new bid deadline was set for June 14, 2018.  AR 21-954.  Amendment 0009 provided new technical exhibits that superseded the old exhibits, AR 21-954, specifying, among other things, work capability levels and providing minimum distances for placement of waste containers from buildings.  AR 21-956 to 62.

On May 23, 2018, Dunning submitted 17 questions about the revised solicitation.  AR 62-2235 to 38.  The Army responded on June 1, 2018, with Amendment 0010, which changed the quantity or description for various contract line items and removed the technical exhibit that specified work capability levels.  AR 22-1103 to 06.[8]  Dunning sent more follow-up questions on June 5, 2018, AR 63-2241, to which the Army responded by Amendment 0011 on June 7 by adding five new contract line items and changing descriptions for several others.  AR 23-1149 to 68.

The Army received two further questions, which it addressed by Amendment 0012 on June 8, 2018.  AR 24-1210.  Amendment 0012, the acceptance of which is at particular issue in this case, contained two terms.  First, it changed the unit description for contract line item 2005 from "Job" to "Months," although all other details including the service and quantity remained unchanged.  AR 24-1210; *compare* AR 25-1238, *with* AR 21-988.  Second, in response to a question about whether "the [g]overnment [will] add additional funding to the contract to cover pickups needed" if "the amounts in the [a]dditional pickup [contract line items] are exceeded," the Army advised:  "[t]hese numbers are estimates, please follow the instructions provided in the solicitation – the [g]overnment will make adjustments as they become necessary."  AR 24-1210.

Each amendment contained a requirement that it be acknowledged by each offeror prior to the close of bidding or by returning a completed copy of the amendment with the proposal submission, by acknowledging receipt on each copy of the offer submitted, or by separate communication to the government.  *See, e.g.*, AR 24-1210 (block 11).  The solicitation also specified that all amendments must be acknowledged "per FAR [c]lause 52.214-3."  AR 25-1307.

---

[8]Specific industry questions corresponding to Dunning's questions of May 23 are contained in AR Tab 62.  The Army's answers do not appear in the record, except that answers to questions 3 and 12 appear in follow-up questions by Dunning.  *See* AR 63-2241 to 42.

### C. *Proposals Received*

The two bids received were opened on June 14, 2018.  AR 3-413; AR 25-1307.  A representative from Dunning was present at the opening.  AR 3-413.  Zero Waste's bid totaled $8,940,875, cumulative of the base year and the four option years.  AR 38-1791.  Zero Waste estimated $1,587,825 for the 10 months of the base year.  AR 38-1791.  Significant cost components included: (1) $26.50 per ton for tipping fees, amounting to $508,800 for the solicitation's estimate of 19,200 tons per month; (2) $65,500 per month to provide and collect weekly 609 eight-cubic-yard containers, amounting to $655,000; (3) $10,000 per month to provide and collect weekly 49 twenty-cubic-yard containers, totaling $100,000; (4) $13,000 per month to provide and collect weekly 16 thirty-five-cubic-yard waste compactors, totaling $130,000; and (5) $10,000 per month to provide and collect weekly 20 forty-cubic-yard containers, totaling $100,000.  AR 38-1792 to 98 (contract line items 0002-0006).  Remaining costs included: $15,000 for phase-in activities; $120 and $140 for each additional 20- and 40-cubic-yard container provided and collected, respectively, totaling $52,000 for 200 additional requests for each; $185 for each additional 35-cubic-yard compactor provided and collected, totaling $14,800 for 80 additional requests; $15 for each additional 8-cubic-yard container provided and collected, totaling $1,200 for 80 additional requests; $10,775 to clean and maintain the appearance of containers; and $250 for manpower reporting.  AR 38-1792 to 98.

Zero Waste's tipping fees, manpower reporting costs, and container cleaning costs remained constant for all five years.  AR 38-1792 to 1842.  Monthly fees for providing and collecting weekly the 8-, 20-, 35-, and 40- cubic-yard containers each increased by approximately 1.5% per year.  AR 38-1791 to 1842.  The per unit cost for each additional request of an 8-, 20-, 35-, or 40- cubic-yard container increased up to 7% annually, though the increase represented no more than an annual difference of $2 per request depending on the container size.  AR 38-1791 to 1842.  Container maintenance costs increased by $1,000 per year, from $1,000 (base year) to $5,000 (option year 4).  AR 38-1791 to 1842.  Based on the solicitation's scope of work estimates, Zero Waste's total estimated price increased by approximately 1% per year.  AR 38-1791.[9]

Zero Waste's proposal included signed copies of Amendments 0001 through 0011.  AR 38-1778 to 89.  Zero Waste's proposal also used "Months" instead of "Jobs" for the unit in line item 2005, as changed by Amendment 0012.  AR 38-1816; *see also* AR 38-1792 to 1847 (showing "0012" in the header on each page of the contract line items).  Further, Zero Waste's proposal represented that it "agrees with all the terms, conditions, and attachments included in the solicitations," and "takes no exceptions to the terms and conditions contained in the solicitation."  AR 38-1777.

Dunning's total estimated price was $10,389,759, inclusive of the base year and the four option years.  AR 33-1511.  Significant cost components of the $1,795,595 estimated for the 10 months of the base year included: (1) $29.50 per ton for tipping fees, amounting to $566,400; (2)

---

[9]The approximate annual price increase of 1% adjusts the total cost of the base year to align with the quantities of the option years, *i.e.*, applies the base year's unit costs to the quantities of the option years.  The base year required two fewer months of service for the standard weekly collection services and estimated 20% fewer additional requests for the 20-, 35-, and 40- cubic-yard containers.

$48,872 per month to provide and collect weekly 609 eight-cubic-yard containers, amounting to $488,720; (3) $23,893 per month to provide and collect weekly 49 twenty-cubic-yard containers, totaling $238,930; (4) $19,549 per month to provide and collect weekly 16 thirty-five-cubic-yard waste compactors, totaling $195,490; and (5) $16,291 per month to provide and collect weekly 20 forty-cubic-yard containers, totaling $162,910.  AR 33-1512 to 14 (contract line items 0002-0006).  Remaining costs included: $1,500 for phase-in activities; $300 for each additional 20- and 40- cubic-yard container provided and collected, totaling $120,000 for 200 additional requests for each; $200 for each additional 35-cubic-yard compactor provided and collected, totaling $16,000 for 80 additional requests; $15 for each additional 8-cubic-yard container provided and collected, totaling $1,200 for 80 additional requests; $4,345 to clean and maintain containers; and $100 for manpower reporting.  AR 33-1512 to 18.

Dunning's tipping fees increased approximately 4% each year, from $29.50 (base year) to $34.25 (option year 4).  *E.g.*, AR 33-1556.  Monthly fees for servicing weekly the 8-, 20-, 35-, and 40-cubic-yard containers also each increased 1% to 2% each year.  AR 33-1512 to 66.  Manpower reporting costs, container cleaning and maintenance costs, and the price for additional 8-, 20-, 35-, and 40- cubic-yard containers remained constant.  AR 33-1512 to 66.  Based on the government's estimates of the scope of services required, Dunning's total estimated price increased by approximately 2% per year.  AR 33-1511.[10]  Dunning's proposal included signed copies of all 12 amendments.  AR 33-1570 to 81.

The Independent Government Cost Estimate ("Government Estimate") calculated a constant annual cost of $2,574,206.64, or $12,871,033.20 cumulative of the base and option years.  AR 1-24 to 26.[11]  Zero Waste's estimated five-year price was 29% below the cumulative Government Estimate while Dunning's estimated five-year price was 17% below.[12]

| Contract Line Item Number & Service | Zero Waste's Unit Price (base year total) | Dunning's Unit Price (base year) | Independent Government Cost Estimate* |
| --- | --- | --- | --- |
| 0001 – phase-in | $15,000 total | $1,500 total | $0 |

---

[10]Here also, the total cost of the base year has been adjusted to align with the quantities of the option years, *i.e.*, applies the base year's unit costs to the quantities of the option years.

[11]Neither the actual Government Estimate nor its assumptions are contained within the record.  Instead, the annual estimate for each contract line item appears in a "Price Abstract," an exhibit filed in a protest by Dunning before the GAO in August 2018.  *E.g.*, AR 1-24.  The figures as set out in the estimate appear to neither account for fewer services requested for the base year nor phase-in or out services.  The government, however, appears to accept the figures.  *See* Def.'s Cross-Mot. at 17.

[12]Given the constant estimate across all five years, the court assumes that the Government Estimate's base year reflects a full year of service, mirroring the amounts in the solicitation's option years, *i.e.*, two additional months of service and 20% more additional containers.  Adjusting the Government Estimate to account for the lower service for the base year called for by the solicitation, the base year would cost $2,237,204.20 and the cumulative cost would be $12,534,030.76.

| | | | |
|---|---|---|---|
| 0002 – tipping fees (for 19,200 tons) | $26.50 per ton ($508,800 total) | $29.50 per ton ($566,400 total) | $29.00 per ton ($556,800 total) |
| 0003 – provide / collect weekly 609 8 CY containers | $65,500 per month ($655,000 total) | $48,872 per month ($488,720 total) | $148,176.22 per month ($1,481,762.20 total) |
| 0004 – provide / collect weekly 49 20 CY containers | $10,000 per month ($100,000 total) | $23,893 per month ($238,930 total) | $3,600 per month ($36,000 total) |
| 0005 – provide / collect weekly 16 35 CY compactors | $13,000 per month ($130,000 total) | $19,549 per month ($195,490 total) | $4,000 per month ($40,000 total) |
| 0006 – provide / collect weekly 20 40 CY containers | $10,000 per month ($100,000 total) | $16,291 per month ($162,910 total) | $5,100 per month ($51,000 total) |
| 0007 – provide / collect 200 20 CY containers as ordered | $120 per container ($24,000 total) | $300 per container ($60,000 total) | $60 per container ($12,000 total) |
| 0008 – provide / collect 200 40 CY containers as ordered | $140 per container ($28,000 total) | $300 per container ($60,000 total) | $85 per container ($17,000 total) |
| 0009 – provide / collect 80 35 CY compactors as ordered | $185 per compactor ($14,800 total) | $200 per compactor ($16,000 total) | $400 per compactor ($32,000 total) |
| 0010 – maintain container appearance | $1,000 per year | $500 per year | $5,000 per year |
| 0011 – clean 609 8CY containers | $15 each ($9,135 total) | $5 each ($3,045 total) | $4.98 each ($3,030 total) |
| 0012 – clean 16 35CY compactors | $40 each ($640 total) | $50 each ($800 total) | $7 each ($112 total) |
| 0013 – manpower reporting | $250 per year | $100 per year | $500 per year |
| 0014 - provide / collect 80 8CY containers as ordered | $15 per container ($1,200 total) | $15 per container ($1,200 total) | $25 per container ($2,000 total) |
| **Total Base Year Estimated Price** | $1,587,835.00 | $1,795,595.00 | $2,237,204.20* |

*The court assumes the Government Estimate reflects a full year of service.  The base year has accordingly been adjusted downward to reflect the reduced service requested by the solicitation for the base year period of ten months.  *See also supra*, at 6-7 nn. 9 & 12.

## D.  *The Army's Award & Responsibility Decision*

The Army notified Zero Waste that it was "the apparent low bidder" on June 15, 2018, the day after bids were opened, and it requested information to verify Zero Waste's responsibility for award.  AR 65-2249 to 51.  Zero Waste responded the same day with financial information and three references involving government waste disposal contracts.  AR 66-2252 to 58.

Also on June 15, 2018, Dunning requested a summary of Zero Waste's prices per contract line item. AR 67-2259. The Army provided a price abstract on June 18, 2018. AR 67-2259, 2262.[13] Later that day, Dunning provided to the Army "a short list of issues that are grounds to file a protest," including Zero Waste's failure to accept all amendments, "[a] massive bid miss [that means] there is no way [Zero Waste] could perform the work," and lack of equipment and experience necessary to perform the contract. AR 68-2267 to 68.

On June 19, 2018, the Army notified both Zero Waste and Dunning, using virtually identical terms, that it suspected a mistake in each bid and asked both bidders to "verify by [contract line item number] the differences in some of [their] pricing in comparison to the other bids or the [Government Estimate]." AR 39-1904; AR 41-1914.[14]

Zero Waste responded on June 20, 2018, having "carefully reviewed its prices and confirm[ing] [its] price is fair and reasonable." AR 42-1915. Zero Waste explained that a "major reason[]" for its lower price was that it "utilized [***]" to "finance the equipment costs at a very good rate and [***]." AR 42-1915. Zero Waste also explained it possessed some required trucks. AR 42-1915. Zero Waste briefly defended each line item, *e.g.*, by stating that its quote for tipping fees "was obtained from a local landfill" and that maintenance costs would be low since it would purchase "all new equipment for this contract." AR 42-1916. Zero Waste also noted that all containers "will already be onsite," to include the possible additional requests for 8-cubic-yard containers as separate from those slated for weekly collection. AR 42-1916 to 17. Zero Waste did not specify whether it planned to store extra containers on-site, either for free or by leasing space on-site as indicated by the Army in Amendment 0004.

Dunning also confirmed its bid as accurate on June 21, 2018, and explained that it could bid below the Government Estimate for two reasons: (1) it had first-hand knowledge of what the contract entails given its performance of the contract for nearly 25 years, and (2) the Government Estimate assumed the need to purchase new equipment and make new logistical arrangements whereas Dunning had the necessary infrastructure in place. AR 40-1905 to 06.[15] Dunning noted that it "has the best [tipping fee] rate in town" and had "confirmed that anyone else searching for a rate [for a landfill that could accommodate the contract] would be in the $36.00 per ton range plus annual increases of approximately 4%." AR 40-1906. Dunning's response also included a critique of Zero Waste's pricing and the Government Estimate. AR 40-1907, 1909, 1912. Dunning specifically challenged Zero Waste's phase-in cost, tipping fee, and lack of equipment,

---

[13]The price abstract compared Dunning's and Zero Waste's prices for each contract line item, but did not include a comparison to the Government Estimate. AR 67-2262; *see also supra*, at 7 & n.11.

[14]The Army's e-mail notification also states that an "abstract of the solicitation" is attached, but the attachment does not appear in the record. AR 39-1904; AR 41-1914. It is not apparent whether this abstract contained the Government Estimate, or, if, like the abstract provided to Dunning the previous day, only disclosed each bid. *See supra*, at 7 n.11.

[15]Dunning claims elsewhere to have been the incumbent for 30 of the last 31 years. *E.g.*, AR 1-27. Either way, Dunning has extensive experience with waste disposal at Fort Benning.

asserting Zero Waste's bid would result in a loss of $1.5 million over the life of the contract and would lead to default.  AR 40-1912. [16]

On July 18, 2018, the Army requested additional information from Zero Waste regarding its finances, noting that the account it provided had a $[***] balance and inquiring how Zero Waste could meet financial obligations.  AR 71-2289.  Zero Waste responded later that day, explaining that the account was an [***] and that it maintained separate accounts for operating expenses, payroll, and an additional [***].  AR 71-2289.  Zero Waste then provided contact information for two operating accounts of undisclosed balances with Citibank and Bank of America, a line of credit with Merrill Lynch with $[***] available as of June 2018, a $[***] line of credit with Citibank dated April 2017, and a $[***] equipment line of credit with Bank of America dated July 2018.  AR 72-2291 to 93.

On August 2, 2018, the Army found Zero Waste to be responsible in accord with the criteria of FAR § 9.104.  AR 73-2294 to 96.  The determination stated that the Army had confirmed financial resources with the financial institutions provided by Zero Waste.  AR 73-2294; *see also* AR 73-2295 (contacting Bank of America); AR 71-2289 (contacting Merrill Lynch).  The Army also found that Zero Waste had or could obtain the skills and equipment necessary to perform the contract.  AR 73-2295 (contacting Bank of America).  Additionally, the Army obtained favorable past performance results from government representatives regarding two waste disposal contracts and found a satisfactory record of performance and integrity after consulting applicable government procurement databases.  AR 73-2294; *see also* AR 73-2302 to 17 (showing five Contractor Performance Assessment Reports ("CPARs") relating to three government waste disposal contracts totaling between $4.8 and $6.0 million, all of which were favorably evaluated).

The Army awarded the contract to Zero Waste on August 10, 2018.  AR 27-1372.  The Army formally notified Dunning by e-mail the same day that Zero Waste was awarded the contract.  AR 74-2323 to 25.

### E.  *Dunning's Post-Award Protest*

Dunning filed a post-award protest with GAO on August 17, 2018, AR 1-1 to 23, and the Army issued a stop-work order on August 20, 2018, AR 76-2330.  Dunning's GAO protest alleged three procurement errors. AR 1-2 to 3, 10.  First, Dunning contended that Zero Waste failed to accept Amendment 0012, rendering Zero Waste's bid non-responsive.  AR 1-11 to 12.  Second, Dunning argued that Zero Waste's bid was unrealistically low and omitted some of the required work.  AR 1-12 to 20.  Specifically, Dunning alleged that Zero Waste "fail[ed] to consider the cost of obtaining the required [equipment]," AR 1-13 to 14, failed to account for the costs of a laydown yard, extra containers, phase-in activities, and requirements imposed by the collective bargaining agreement, AR 1-17 to 19, and relied on tipping fees well below what was

---

[16]Dunning also initiated a post-bid, pre-award protest with the Small Business Administration on June 21, 2018, challenging Zero Waste's status as a small business.  AR 69-2278.  The solicitation specified a 100% set-aside for small businesses.  AR 25-1212.  The Small Business Administration found that Zero Waste met the small-business criteria for its industry at the time of bid submission.  *See* AR 70-2281 to 88 (Small Business Administration size determination).

presently available, which would result in a loss of $700,000 over the life of the contract.  AR 1-14 to 15.[17]  Third, Dunning contended that Zero Waste was not a responsible bidder because it lacked the necessary equipment and had always relied on an experienced subcontractor to handle its other waste disposal contracts.  AR 1-20 to 21.  Dunning filed a supplemental protest on August 24, 2018, AR 2-33, alleging that Zero Waste has engaged in a "serial pattern of underbidding . . . work, which it has no capability to perform."  AR 2-36.  Support for Dunning's contentions consisted primarily of two affidavits from Dunning's Chief Operating Officer.  *See generally* AR 1-12 to 21 (citing to the first affidavit, appearing at AR 1-27 to 31).

On September 17, 2018, GAO dismissed Dunning's second and third allegations, *i.e.*, the price realism claim and the responsibility claim.  AR 7-430.  As GAO later explained, Dunning's "argument about the realism of the awardee's price overlooks the inapplicability of price realism concepts to a sealed bid procurement," and it is not illegal for an offeror to bid, or the government to accept, a low or below-cost bid.  *Mark Dunning Indus., Inc.*, B-415890.2, 2018 CPD ¶ 382, 2018 WL 5881660, at *3 (Comp. Gen. Nov. 5, 2018).  While a low bid may implicate a bidder's responsibility, the Army found Zero Waste responsible and GAO "will generally not review affirmative determinations of responsibility" unless the contracting officer "unreasonably failed to consider available relevant information."  AR 30-1497 to 98 (citations omitted).

On November 5, 2018, GAO dismissed the claim regarding Amendment 0012, finding that Zero Waste "constructively acknowledged" Amendment 0012 when it changed line item 2005 in its bid to reflect the Amendment.  AR 30-1496.  GAO also rejected the materiality of the question and answer of Amendment 0012, finding formal acknowledgment unnecessary because it represented guidance to bidders "to follow the terms of the solicitation."  *Mark Dunning Indus.*, 2018 WL 5881660, at *2.[18]

Dunning filed its complaint in this court on November 21, 2018.  Compl. at 1.

## JURISDICTION & STANDING

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act vests this court with jurisdiction to "to render judgment on an action by an interested party objecting to a . . . proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

A threshold issue is whether Dunning has standing to challenge the award decision, a burden it bears as plaintiff.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d

---

[17]Dunning also alleged that Zero Waste acquired its $26.50 tipping fee figure from an improper disclosure of Dunning's actual fee from 2015.  AR 1-14 to 15.  There was no impropriety, however.  The Army had disclosed in Amendment 0002 that the per ton tipping fee for 2016 was $26.50.  AR 14-856.

[18]GAO dismissed Dunning's supplemental protest because it merely furnished additional information to support the original protest.  *See Mark Dunning Indus.*, 2018 WL 5881660, at *3 n.4.

1366, 1369-70 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To demonstrate standing under 28 U.S.C. § 1491(b)(1), Dunning must be an "interested party" who suffered prejudice from a significant procurement error.  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).  An interested party is an actual bidder who had a substantial chance at award of the contract.  *Id.*; *see also Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)).  An interested party suffers prejudice from a significant procurement error when "*but for the error*, it would have had a substantial chance of securing the contract." *CliniComp*, 904 F.3d at 1358 (emphasis in original).

Dunning's allegations and the administrative record indicate that Dunning is an interested party who has sufficiently alleged prejudice.  Dunning was one of two actual bidders.  It challenges the responsiveness of Zero Waste's bid and Zero Waste's responsibility.  These challenges, if accepted, would leave Dunning as the only responsible and responsive bidder.  Therefore, Dunning has standing and the court has jurisdiction.

## STANDARD OF REVIEW

### A. *Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's review of a protest of the government's decisions regarding award of a contract.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under the APA, the court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion*, 115 Fed. Cl. at 550.

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Id.* (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).  The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues," *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech*, 554 F.3d at 1037 (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).

Protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## ANALYSIS

### A. *The Compliance of Zero Waste's Bid*

Dunning contends that Zero Waste submitted a defective bid, and thus was ineligible for consideration, because Zero Waste did not accept Amendment 0012.  Pl.'s Mot. at 11-13.  Dunning contends that even if Zero Waste constructively accepted the change in units for contract line item 2005, Amendment 0012 also contained material information regarding future price adjustments, which required Zero Waste's formal acceptance.  *Id.* at 12-13.

The government counters that Zero Waste constructively acknowledged the entirety of Amendment 0012 by incorporating the change to contract line item 2005 in its bid.  Def.'s Cross-Mot. at 11-14.  Additionally, the government contends that under the sealed bidding procedures of FAR Part 14, if there is evidence that a bidder received the amendment, the bidder is bound to perform even absent express acknowledgment of the amendment, and the government may waive formal acceptance.  *Id.* at 13-14.  The government also dismisses the materiality of the question answered by Amendment 0012, as it "merely advised offerors to follow the terms of the solicitation."  *Id.* at 15 (quoting AR 30-1496 to 97, GAO's dismissal decision of Nov. 5, 2018).

"Any bid that fails to conform to the *essential* requirements of the invitation for bids shall be rejected."  FAR § 14.404-2(a) (emphasis added).  The solicitation required bidders to "acknowledge receipt of any amendment" by five enumerated methods: "signing and returning the amendment," "identifying the amendment number and date in space provided for this purpose on the form for submitting a bid," "letter," or, if authorized by the solicitation, by facsimile or e-mail.  FAR § 52.214-3; *see also* AR 25-1278 (incorporating by reference FAR § 52.214-3).  Each amendment contained similar language.  *See, e.g.*, AR 24-1210 (block 11).

Procurement regulations for sealed bidding allow the offeror to cure or the government to waive "[a] minor informality or irregularity" if "to the advantage of the [g]overnment."  FAR § 14.405; *accord* FAR § 52.214-10(b) (incorporated by reference at AR 25-1308).  "A minor informality or irregularity is one that is merely a matter of form and not of substance" or that has negligible "effect on price, quantity, quality, or delivery."  FAR § 14.405.  Thus, in sealed bidding, failure to acknowledge receipt of an amendment is "a minor informality or irregularity" when the "bid received clearly indicates that the bidder received the amendment, such as where the amendment added another item . . . and the bidder submitted a bid on the item."  FAR § 14.405(d)(1).  Amendment 0012 changed the units in line item 2005, a change that Zero Waste incorporated into its bid submission.  That Zero Waste incorporated this change shows it received the Amendment, including the brief question and answer immediately below the change to contract line item 2005.

Additionally, in sealed bidding, failure to acknowledge receipt of an amendment is also "a minor informality or irregularity" when the "amendment involves only a matter of form or has either no effect or merely a negligible effect on price, quantity, quality, or delivery."  FAR § 14.405(d)(2).

13

The court finds that Zero Waste constructively accepted the change to contract line item 2005. Regardless of whether the change of units for line item 2005 from "Job" to "Month" was a material change or as confusing as Dunning alleges given the context of the description, *e.g.*, Pl.'s Reply at 5-6, Zero Waste's bid used the correct unit, *see* AR 38-1816 (contract line item 2005 reflecting 12 months). As it is evident that Zero Waste bid on the correct quantity of the correct units for the correct description, the Army did not commit error by finding the bid compliant.

Apparently anticipating this outcome, Dunning instead focuses its argument on the question answered in Amendment 0012 regarding the "[a]dditional pickup [contract line items]," *i.e.*, line items 0007, 0008, 0009, and 0014, and the corresponding requests in the option years. Pl.'s Mot. at 11-13; *see also* AR 24-1210 (Amendment 0012); AR 25-1217 to 18, 1220 (line items in the final amended solicitation for the extra pick-ups). These line items request an estimated annual number of extra, unscheduled containers of each size. *E.g.*, AR 25-1217 to 18, 1220 (base year).

Dunning's attempt to parse the Army's answer to find some aspect of materiality is unavailing. Quantities for additional pick-ups were already identified by the solicitation as "estimates" and the descriptions explain that the contractor must provide and collect "as ordered." *E.g.*, AR 25-1227 (showing line item 1006, additional pick-ups for 20-cubic-yard containers). The project work statement included provisions for special tasks, special events, and other work, AR 25-1332 to 34 (subsections 3.4.6 - 3.4.8), and where work was "within the scope of the contract, but [] not expressly specified," the Army would negotiate with the contractor for a firm-fixed-price, AR 25-1334 (paragraphs 3.4.8.1 and 3.4.8.3). The solicitation identified itself as a "Indefinite Delivery Indefinite Quantity [] contract with Firm-Fixed Price [] task orders." AR 25-1298 (incorporating FAR § 52.216-1). Accordingly, provisions allowing for the Army to make adjustments already existed in the solicitation, and, as the Army noted in Amendment 0012, bidders should "please follow the instructions." AR 24-1210. The government was free to waive formal acceptance if in its interest, *e.g.*, AR 25-1308 (incorporating by reference FAR § 52.214-10(b)), which in this instance would allow it to award to the lowest bidder, Zero Waste.

## B. *Zero Waste's Low Price*

Dunning next argues that Zero Waste's bid is "unrealistically low," Pl.'s Mot. at 14, in part a result of having "failed to bid key requirements of the [w]ork," *id*. at 20. Dunning supports its claim of a "drastic underbid" by arguing that Zero Waste failed to include the cost to obtain the necessary equipment and underestimated tipping fees by $700,000 over the life of the contract, "putting it at "near-certain risk of default." *Id*. at 14-18; *see also* Pl.'s Suppl. Reply at 14-16. Dunning also argues that Zero Waste's underbidding "is part of an intentional pattern of extreme underbidding aimed at obtaining contracts under false pretenses," and briefly lists Zero Waste's bids on five other government waste disposal contracts as evidence. Pl.'s Mot. at 19-20. Dunning further specifies three examples of work excluded from Zero Waste's bid: (1) not accounting for the cost of a laydown yard, (2) failing to include the cost to purchase 65 extra containers for unscheduled events and the cost to service these containers 50 to 80 times per month, and (3) not bidding all phase-in activities. *E.g.*, *id*. at 21-23. Dunning further alleges that Zero Waste will violate the collective bargaining agreement by using its contract manager as a driver. *Id*. at 23-24. Dunning presented its concerns to the Army pre-award, but after bid

opening, and it argues that despite the Army suspecting a mistake in the bid, the Army "failed to perform anything close to reasonable due diligence." Pl.'s Suppl. Reply at 16.

The government counters that the Army had no obligation under the solicitation to conduct a price realism analysis and that in a fixed-price procurement, there is nothing inherently problematic with an offeror bidding below cost. Def.'s Cross-Mot. at 17-18. The government also rejects Dunning's proffered factual contentions as after-the-fact "conjecture," noting the frequency with which Dunning relies on the affidavits of its Chief Operating Officer for support. *Id.* at 19-20 & nn. 7, 8. The government relies on the fact that the solicitation did not include contract line items "for a laydown yard, unscheduled pickups, or phase-in activities," and bidders consequently were not required to price those items. *Id.* at 19 n.7.

Sealed bidding procedures required the Army to "evaluate the bids . . . without discussion" and to "award a contract to the to the responsible bidder whose [conforming] bid will be most advantageous to the [g]overnment considering only price and the price-related factors specified in the solicitation." FAR § 52.214-10(a); *see also* AR 25-1278 (incorporating by reference FAR § 52.214-10); FAR §§ 14.103-2(d), 14.408-1(a). Per the solicitation, price was the only evaluative criterion; the Army would award the contract to "the responsible bidder whose bid represent[ed] the lowest price for the required services per FAR [§] 52.214-10." AR 25-1308. Here, Zero Waste offered the lowest bid. *E.g.*, AR 65-2249.

Contrary to the government's assertion, however, the Army may not just accept the lowest priced offer. Rather, the Army must award the contract to the "responsible bidder whose bid, conforming to the solicitation, [is] most advantageous to the [g]overnment," and "may . . . accept other than the lowest bid." FAR §§ 52.214-10(a), (b). Relatedly, when considering price, the contracting officer "shall determine . . . that the prices offered are reasonable . . . in light of all prevailing circumstances" and "shall consider whether bids are materially unbalanced." FAR §§ 14.408-2(a), (b); *see also* FAR § 52.214-10(e). The contracting officer may reject any bid that is (1) "unreasonable as to price" or (2) where "prices for any line items or subline items are materially unbalanced [per FAR § 15.404-1(g)]." FAR § 14.404-2(f), (g); *see also* FAR § 52.214-10(e). The contracting officer "[may use the] price analysis techniques in [FAR §] 15.404-1(b) [] as guidelines," FAR § 14.408-2(a), to include comparisons with "proposed prices received in response to the solicitation," "historical prices paid" for similar services, "independent [g]overnment cost estimates," or "prices obtained through market research for the same or similar items." FAR § 15.404-1(b)(2).

### 1. *Reasonableness of Zero Waste's low bid.*

Dunning, as the incumbent for more than 25 years, put forward a bid that constitutes a reasonable comparison point. *See* FAR § 15.404-1(b)(2) (stating that acceptable price analysis techniques include comparison with "proposed prices received in response to the solicitation" or with "historical prices paid" for similar services). Zero Waste's aggregate bid was approximately 14% below Dunning's, with four of the five contract line items constituting the bulk of the bid below Dunning's, and those four partially offset by the one item above.[19]

---

[19]Overall, line items for the tipping fees and the weekly regular service for the 8-, 20-, 35- and 40- cubic-yard containers represented 94% of Zero Waste's total bid and 92% of Dunning's.

Further, Zero Waste's bid is 29% below the Government Estimate. *See* FAR § 15.404-1(b)(2) (permitting comparison with an independent government estimate).[20]   Accordingly, Zero Waste's price does not appear unreasonably high or low.

For a fixed-price contract, entering a bid with a low profit margin, or even bidding below cost, has no bearing upon price reasonableness. *See UnitedHealth Military & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 554 (2017) ("[A] price reasonableness analysis [as opposed to a price realism analysis] considers whether an offerors' price is too high."); *Munilla Constr. Mgmt., LLC v. United States*, 130 Fed. Cl. 635, 649 (2017) (same); *EMTA Isaat, A.S. v. United States*, 123 Fed. Cl. 330, 338 n.9 (2015) (same); *Patriot Taxiway Indus., Inc. v. United States*, 98 Fed. Cl. 575, 587 (2011) (same); *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 657 n.5, 663 n.11 (2010) (same); *see also KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 358 n. 15 (2015) ("[B]elow-cost offers, also known as 'buy-in' offers, are not prohibited.") (citation omitted); *CRAssociates, Inc. v. United States*; 95 Fed. Cl. 357, 380-81 & n. 24 (2010) (finding below-cost pricing permissible); *CC Distrib., Inc. v. United States*, 69 Fed. Cl. 277, 284 (2006) (finding that in a fixed-price contract, below-cost pricing is permissible and by itself does not justify finding a contractor not responsible); *Triple H. Servs.*, B-298248, 2006 CPD ¶ 115, 2006 WL 2136705, at *2 (Comp. Gen. Aug. 1, 2006).

Contrastingly, a price realism or cost realism analysis would allow an agency to "verif[y] that the offeror's price is not overly optimistic and impractically low." *DMS All-Star*, 90 Fed. Cl. at 663 (citing *Pemco Aeroplex, Inc.*, B-310372.3, 2008 CPD ¶ 126, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008)).  But such an analysis is normally not required in fixed-price contracts, and if the agency intends to conduct one, it must be expressly stated in the solicitation. *Id.* at 663-664; *see also UnitedHealth*, 132 Fed. Cl. at 561 ("In accordance with the well-established principle that an agency must evaluate proposals in accordance with the solicitation terms, it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria."); *see also, e.g.*, FAR § 14.103-2 ("An award is made . . . considering only the price and price-related factors included in the [solicitation], as provided in [the sealed bidding award procedures of FAR] subpart 14.4.").  The solicitation in this case lacked an express or implied requirement to conduct a realism analysis.

A low price may, however, be evidence of a mistaken or defective bid.  To be eligible for award, a bid must "conform to the essential requirements of the invitation for bids" and may neither "modify requirements . . . or limit the bidder's liability to the [g]overnment."  FAR § 14.404-2(a) to (d).  For example, in *Hyperion*, the highest priced offeror suggested that the lower prices of the other three proposals indicated that none would comply with the limitations on subcontracting.  *Hyperion*, 115 Fed. Cl. at 550-52.  The court concurred, despite the government's assertion that "by submitting proposals, all offerors agreed to comply."  *Id.* at 551-52.  The court found labor costs to be "suspiciously low," which upon examination, revealed "an

---

[20]While the Army ostensibly prepared an Independent Government Cost Estimate and FAR § 15.404-1(b)(2) permits its use as a point of comparison, details of the estimate are absent from the record.  *See supra*, at 7 n.11 and accompanying text.  For purposes of price reasonableness, the court compares only the aggregate estimated price.

apparent mis-characterization of labor as a [cost for] material" that if corrected would make proposals non-compliant with subcontracting requirements of the solicitation. *Id*. at 552-53.

Dunning's low-price allegation contrasts with that in *Hyperion*. Zero Waste's prices do not indicate that it will violate a technical requirement. Zero Waste bid all line items, *see* AR 38-1791 to 1842, the technical requirements are to perform specified waste disposals services, which Zero Waste's proposal confirmed that it will perform, and the individual services required are straightforward. For example, line item 0002 requests the price per ton to dispose of waste. AR 38-1792. Line item 0003 requests bidders to price by month the cost to "[p]rovide and [c]ollect (609) eight[-]cubic[-]yard [] bulk waste containers, service & transport to disposal facility [and] [e]mpty containers at least once a week [if 85% full]." AR 38-1793. Line item 0011 requests the price to keep clean each of the 609 8-cubic-yard containers. AR 38-1797. The performance work statement provides similar details. *See, e.g.*, AR 25-1313 (requiring weekly service and when containers are 85% full), 1324 to 25 (specifying manpower reporting requirements), 1329 to 30 (specifying inventory, maintenance, and cleaning requirements). To sum, in *Hyperion*, low price indicated a likely inability to comply with a technical requirement. In this instance, by contrast, low price indicates low price. To the extent Zero Waste's prices are low, the low prices implicate its financial ability to perform, not the technically acceptability of the proposal.

Dunning's specific allegations that work was excluded from Zero Waste's bid lacks support. Although Dunning asserts that Zero Waste's bid did not account for a laydown yard, Pl.'s Mot. at 21, no such line item existed for Zero Waste to bid. Presumably, a bidder would apportion the cost of a yard among other line items. But Zero Waste had neither an obligation nor opportunity to break out such costs. *See* AR 25-1214 to 64 (not including a laydown yard among the list of line items upon which Zero Waste had to bid). Also, Zero Waste did bid on phase-in activities. AR 38-1792 (bidding $500 per day for 30 days). Perhaps it did bid below cost, as Dunning alleged. *See* Pl.'s Mot at 22-23 (alleging Zero Waste underbid phase-in activities by $85,000). Yet, so long as Zero Waste intended to complete the required phase-in work, Zero Waste's bid did not exclude this key scope of work regardless of whether it will perform the work below cost. Then too, Dunning's only support for its allegations that Zero Waste's bid did not conform to the collective bargaining agreement appears in a post-award affidavit of Dunning's Chief Operating Officer, and that affidavit provides no specific details upon which to assess the accuracy of his asseverations. AR 1-30 (¶ 20).

Additionally, there is no contractual requirement to "purchase . . . the 60 or so unscheduled roll-off [*i.e.*, the 20- and 40- cubic-yard] containers needed for unscheduled pickups [or the] 5 thirty-five cubic yard compactors" as alleged by Dunning. Pl.'s Mot. at 22; *see also* AR 1-27, 29-30 (affidavit ¶¶ 5, 18, 19). Dunning may have projected or surmised such a requirement based on its extensive first-hand knowledge of actual requirements from decades of incumbency. *E.g.*, 1-27 (affidavit ¶¶ 3, 4, 7, 8). But Zero Waste must bid on the solicitation, not on Dunning's knowledge. What the solicitation requires is the ability to provide additional 8-, 20-, 35-, and 40- cubic-yard containers as ordered, up to 80, 250, 100, and 250 additional orders of each per year, respectively, AR 25-1227 to 28, 31 (using full-year estimates of the option years), and to provide containers as needed for special tasks, unscheduled clean-ups, or other similar but unspecified waste disposal services, AR 25-1332 to 34. There is neither a fixed number of extra containers to have on hand nor a requirement that they be purchased. Zero

Waste could, for example, rent them as needed.  And, Zero Waste indicated when confirming its bid that it had factored into price the purchase of extra containers.  AR 42-1916 to 17 ("Zero Waste factored additional purchase of 10% of [20-cubic-yard] containers . . . [,] 30% of [40-cubic-yard containers . . . [, and] 40% of [35-cubic-yard] containers.").  Finally, if Zero Waste assumed it could store equipment on-site for free and if this is in error, such a mistake is Zero Waste's to bear.[21]  So too are other alleged unilateral mistakes, especially after Zero Waste confirmed the accuracy of its bid.

In any event, the Army informed Zero Waste that it suspected errors in the low bid, ostensibly after receiving a challenging e-mail from Dunning, and requested Zero Waste to confirm the price of each line item.  AR 41-1914.  Zero Waste confirmed its bid for each line item and provided a brief justification for each.  AR 42-1915 to 17.  Zero Waste explained that it had obtained favorable financing terms, already had some trucks, and "obtained [its tipping fee] from a local landfill."  AR 42-1915.  With Zero Waste's bid 14% lower than that of the incumbent, Dunning, the Army did not act unreasonably by accepting Zero Waste's confirmation and explanation.  *See, e.g.*, *Patriot Taxiway*, 98 Fed. Cl. at 587 ("To the extent [plaintiff] alleges that [the successful bidder's] price was unreasonably low," "[plaintiff] has not established that the [award] to the low-priced, technically acceptable contractor was arbitrary or capricious" when "[the agency] entered into discussions to ensure that offerors' prices were accurate [and] confirm[ed] prices [before awarding to the lowest bidder].").

To the extent that Zero Waste intended to bid low and the end result is that Zero Waste performs at or below costs, it would bear only upon Zero Waste's responsibility, but not upon the reasonableness of its price.  *See, e.g.*, *CRAssociates*, 95 Fed. Cl. at 380-81 & n. 24 (evaluating below-cost price for impact on a responsibility determination); *CC Distrib.*, 69 Fed. Cl. at 283-84 (same).

2.  *Balance among contract line items.*

"Unbalanced pricing exists when, despite an acceptable total price, the price of one or more line items is significantly over or understated as indicated by the application of . . . price analysis techniques."  FAR § 15.404-1(g)(1).  The contracting officer must analyze "[a]ll offers with separately priced line items . . . to determine if the prices are unbalanced," must consider whether award "will result in paying unreasonably high prices for contract performance," and may reject an offer whose "lack of balance poses an unacceptable risk to the [g]overnment."  FAR § 15.404-1(g)(2); *see also* FAR §§ 14.404-2(g), 14.408-2(b).

Dunning's bid presents a reasonable comparison point.  *See* FAR § 15.404-1(b)(2).[22]  Zero Waste underbid Dunning in all but one of the high-value line items, namely tipping fees

---

[21]The solicitation does not indicate that the Army would fail to provide a free laydown yard.  While the solicitation does require the contractor to furnish anything required to execute the contract and to remove all equipment each day, AR 25-1352, the Army could furnish any material, equipment, or supplies, AR 25-1352, and it also indicated a willingness to lease an on-site laydown yard, AR 16-938 to 39.

[22]The Government Estimate may not be as appropriate for comparison.  *See supra*, at 7 n.11 and 16 n.20 and accompanying text.  For many line items, the Government Estimate

and weekly service of the 8-, 20-, 35-, and 40- cubic-yard containers. *See, e.g.*, AR 67-2262 (bid price abstract).[23]  These line items, while presented as estimates, are stable.  The quantity of containers to service weekly is fixed.  *See* AR 25-1215 to 16 (609 8-cubic-yard containers, 49 20-cubic-yard containers, 16 35-cubic-yard compactors, and 20 40-cubic-yard containers).  The unit price is based on the number of months, AR 25-1215 to 16, a constant 12.  Bidders cannot profit from tipping fees.  *See* AR 14-856.  These line items are therefore not susceptible to manipulation or error in estimation that would cause the lowest bid to generate "unreasonably high prices for contract performance."  Thus, Zero Waste's bid appears balanced, and the Army did not act unreasonably by accepting it.

## C.  *The Army's Responsibility Determination*

Dunning alleges that the Army erred in its determination of Zero Waste's responsibility because Zero Waste "has never performed the core functions of a solid waste collections contract," but has instead relied on "another experienced subcontractor."  Pl.'s Mot. at 25, 26.  Further, Dunning alleges that Zero Waste lacks any of the necessary equipment, and to the extent Zero Waste could procure the equipment, it is evidence of Zero Waste's unrealistically low bid.  *Id*. at 25, 27.  Further, Dunning argues that it advised the Army pre-award that Zero Waste "'would have to purchase $2,600,000.00 in new equipment' to perform," but Zero Waste only had a $[***] equipment financing line of credit while actively pursuing other waste management contracts.  Pl.'s Suppl. Reply at 18 (quoting AR 40-1912) (Dunning's letter confirming the accuracy of its bid); *see also* Pl.'s Mot. at 14 (suggesting [***]).  Dunning's source of information for the stated allegations is either not disclosed or identified as "industry sources."  *See* AR 1-27, 29-30 (first affidavit ¶¶ 5, 18, 19); AR 40-1907 (Dunning's bid verification); Pl.'s Mot. at Attach. 2 (third affidavit ¶¶ 6, 7).  Nevertheless, Zero Waste did indicate that apart from several trucks, it would purchase all new equipment for the contract.  *See* AR 42-1915 to 17.  Overall, Dunning asserts that had the Army properly considered the circumstances and evaluated the adequacy of Zero Waste's finances, it would not have found Zero Waste to be responsible.  *See* Pl.'s Mot. at 27; Pl.'s Suppl. Reply at 18-19.  The government counters that Dunning's challenge rests on "wholly speculative and unsupported" post-award "conjecture" of Dunning's Chief Operating Officer.  Def.'s Cross-Mot. at 19-20.

The contracting officer may only award contracts to responsible offerors.  *E.g.*, FAR §§ 9.103, 14.408-2.  To find a prospective awardee responsible, the Contracting Officer must find that the bidder has adequate financial resources; adequate management, experience, and productive capacity to perform; and a satisfactory record of performance, ethics, and integrity.  *See* FAR § 9.104-1.  A contracting officer must obtain sufficient information to make a responsibility determination, *see* FAR § 9.105-1, has "wide discretion" regarding the determination, and "is the arbiter of what, and how much, information he [or she] needs," *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999); *accord Bender*

---

appears inexplicably high or low compared to the bids.  *See* AR 1-24 (listing estimated prices two to three times higher for weekly service of the 8-cubic-yard containers, two to seven times lower for the other weekly container services, two to five times lower for each additional 20- or 40- cubic-yard container, and two times higher for each additional 35-cubic-yard container).

[23] *See* discussion *supra*, at 17.

*Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (quoting *Impresa Construzioni*, 238 F.3d at 1334-35).  That discretion may not be overturned if exercised reasonably and in conformance with law and regulation.  *See, e.g.*, *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010); *Axiom*, 564 F.3d at 1381-82 (citing *Impresa Construzioni*, 238 F.3d at 1334).

The Army checked Zero Waste's financial resources and, when the Army had further questions about financial resources, it sought additional information from Zero Waste.  *See, e.g.*, AR 71-2289 to 90.  Zero Waste provided evidence that it had nearly $[***] in two lines of credit for operating expenses and a $[***] line of credit for equipment.  AR 72-2291 to 93.  Two of these lines of credit, totaling $[***], were dated within six weeks of the responsibility determination.  AR 72-2292 to 93 (showing that Merrill Lynch confirmed $[***] available as of June 20, 2018, and Bank of America confirmed $[***] available through July 3, 2019).  In verification, the Army also contacted representatives of Bank of America and Merrill Lynch, *see* AR 71-2289 to 90; AR 73-2294 to 95; *see also* AR 72-2291 to 92 (points of contacts for Zero Waste's financial institutions).

While Dunning contends that Zero Waste's lines of credit will not suffice for the needed equipment, the Army's contrary finding was rational based upon its review of Zero Waste's financial information.  The $2.6 million equipment cost cited by Dunning, while presented to the Army pre-award, is without support and the Army need not accept Dunning's assumptions about Zero Waste's equipment costs, especially when those assumptions were provided after Dunning learned that it was underbid by Zero Waste.  Even accepting this figure does not imperil the Army's determination.  It knew that Zero Waste already had some equipment, *see* AR 42-1915, and Bank of America and Merrill Lynch confirmed sufficient financial backing, *see* AR 73-2294 to 95.  Zero Waste's $[***] operating lines of credit also appear sufficient to cover losses that could result from below-cost pricing, if Zero Waste's bid is indeed below cost, on a contract valued up to $13 million.  *See* AR 1-26 (showing the Government Estimate for five years).

Perhaps most importantly, the Army also obtained past performance information from Zero Waste.  The Army confirmed past performance by contacting two other military facilities where Zero Waste had performed, obtaining favorable references.  AR 73-2294 to 95.  The Army also reviewed five CPARs covering three government waste disposal contracts, all of which showed favorable evaluations.  AR 73-2302 to 17.  Even if Zero Waste had relied upon subcontractors in the past, it is not unreasonable for the Army to find that Zero Waste could perform the contract when considering its successful past performance in managing similar contracts and the experience it would have gained in that process.

The government also defends Zero Waste's price by pointing to cases where prices up to 60% below an Independent Government Cost Estimate were deemed realistic.  *See* Def.'s Cross-Mot. at 18 (quoting *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 405 n.9 (2015) (citing *Preferred Sys. Solutions, Inc. v. United States*, 110 Fed. Cl. 48 (2013)).  Dunning contends that *Preferred Systems* actually demonstrates that the agency could accept such a low bid "only based upon the steps taken to verify the veracity of the bid [and] the offeror's ability to perform."  Pl.'s Reply at 9-10 (citing *Preferred Sys.*, 110 Fed. Cl. at 61) (emphasis omitted).  But, as discussed, price realism principles are inapplicable to this solicitation.  And in any event, the Army investigated Zero Waste's ability to perform by asking Zero Waste to verify its bid and then by examining financial resources and past performance.

The Army used a standard form to document its responsibility determination, but that use is not contrary to procurement regulations. A contracting officer does not need to formally state the basis of a determination when finding the bidder responsible. *Impresa Construzioni*, 238 F.3d at 1337-38 (citing FAR § 9.105-2(a)). To the contrary, he or she need only append the supporting materials to the contract file, FAR § 9.105-2(b)(1), as was done here. Given the presumption of regularity afforded to contracting officials, *see, e.g.*, *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 568-69 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013), the court cannot find that the Army failed to investigate responsibility in any material way, absent evidence to the contrary. The Army's responsibility determination, while using standard language, was tailored when applicable, such as by naming the past performance ratings or the financial references that the contracting officer contacted. *See* AR 73-2294 to 95. Accordingly, the Army's responsibility decision appears rational.

## D. *The Army's Treatment of Bidders*

Dunning's last contention of procurement error is that the Army advised Dunning that it would no longer provide a laydown yard for use, but had told Zero Waste that the Army "would provide the laydown yard at no cost at the pre-award meeting." Pl.'s Mot. at 27. Dunning further alleges that the Army's contracting officer's representative "later confirmed to [Dunning] that [Zero Waste's] bid was based on [Zero Waste's] intent to utilize the laydown yard at no cost." Pl.'s Mot. at 27. Dunning contends this informational asymmetry helped Zero Waste underbid Dunning. Pl.'s Mot. at 27-28. The government rejects Dunning's contention as lacking any supporting evidence. Def.'s Cross-Mot. at 19 n.7.

The solicitation required that "[a]ny information given a prospective bidder concerning a solicitation will be furnished promptly to all other prospective bidders as an amendment to the solicitation," while pre-award oral explanations or instructions "will not be binding." AR 25-1278 (incorporating by reference FAR § 52.214-6). Government procurement regulations further prohibit conduct that "[f]avors one offeror over another," FAR § 15.306(e)(1), which would include "giving materially disparate information to bidders on matters that could easily affect their decisions about important aspects [of their bids]," *Raytheon Co. v. United States.*, 809 F.3d 590, 596 (Fed. Cir. 2015); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004) ("[U]neven treatment goes against the standard of equality and fair play that is a necessary underpinning of the government's procurement process."), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

It would be procurement error if the Army pre-bid told one bidder that a laydown yard was available without charge while telling the other bidder that the laydown yard was the bidder's responsibility. A laydown yard arguably would represent a non-trivial cost that could affect prices. Although the solicitation did not contain a separate line item for a laydown yard, a bidder could be expected to factor the cost for a yard into its pricing for other services. Dunning, however, provides no evidence to support its allegation. *See* Compl. ¶¶ 89-93; Pl.'s Mot. at 27-28; Pl.'s Reply at 18-19; Pl.'s Suppl. Reply at 19-20. Dunning makes a single reference to the record, citing to an e-mail from its Chief Operating Officer to the Army. Pl.'s Suppl. Reply at 19 (citing AR 68-2267 to 68). But pertinent to the laydown yard, the e-mail only alleges that Dunning believes Zero Waste underbid the contract by in part failing to account for a laydown yard. *See* AR 68-2267 to 68. This e-mail does not actually state or indicate what information the Army provided to either bidder or who provided any such information, or if it was provided pre-

21

bid.  Dunning's Chief Operating Officer states that Zero Waste "prepared its bid based on the *mistaken understanding* that [the Army would provide a laydown yard]," Pl.'s Mot. Attach. 2 ¶ 8 (third affidavit) (emphasis added), and "relied on [an] inaccurate belief that the [Army] would provide a no cost laydown yard," AR 1-29 (first affidavit, at ¶ 17).  Even if true, Zero Waste's unilateral mistake would have no bearing whether the Army disseminated unequal material information prior to the bid deadline.  Absent any evidence either in the record or otherwise produced by Dunning, Dunning's claim of unequal information, and prejudice from it, must fail.

The solicitation specified that the Army had no obligation to provide any materials, property, equipment, items, or services, AR 25-1351; *see also* AR 25-1312, and that the contractor must "remove all vehicles, trailers and equipment from the installation at the end of each workday."  AR 25-1352.  But the solicitation also specified that the contracting officer could allow equipment to remain onsite, AR 25-1352, and that the Army had the right to provide any of the materials, property, or equipment that was to be furnished by the contractor, AR 25-1352.  The Army also indicated in Amendment 0004 that an on-site laydown yard "can be leased to contractors by the [Army]," AR 16-938 to 39 (Amendment 0004, questions 19 and 24).  While guidance about the laydown yard in the solicitation may be ambiguous, which may have caused Dunning and Zero Waste to form their bids using different assumptions, it is now too late to protest the language of the solicitation.  *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313, 1315 (Fed. Cir. 2007).  And in any event, the information in the solicitation was available equally to all.

## CONCLUSION

For the foregoing reasons, Dunning's motion for judgment on the administrative record is DENIED and the government's cross-motion for judgment on the administrative record is GRANTED.  The clerk shall enter judgment accordingly.[24]

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[24]Dunning requested $8,150 in attorneys' fees pertaining to preparation of its supplemental reply.  *See* Pl.'s Fees Mot.; *see also supra*, at 2.  The fees "relate solely to [16.3 hours for] preparing and filing the supplemental brief," and not to time spent reviewing the documents added to the record by the third correction.  Pl.'s Fees Mot. at 2, Attach. 1. Dunning's motion for an award of attorneys' fees is DENIED.  Dunning is not a prevailing party and the court finds insufficient grounds to impose sanctions on the government under RCFC 37 for its belated third correction to the administrative record, even though that correction was quite extensive.